IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARIA GUADALUPE HERRERA, | § | |
| INDIVIDUALLY AND AS NEXT FRIEND OF | § | |
| UN, YN, YN and AIN, HER MINOR CHILDREN, | § | |
| and MARIA GERMANA OLGUIN, | § | |
| Plaintiffs | § | |
| | § | C. A. No. 4:18-cv-3812 |
| VS. | § | |
| | § | PLAINTIFFS DEMAND TRIAL |
| AEROVIAS DE MÉXICO, S.A. DE C.V. (INC.), | § | BY JURY |
| d/b/a AEROMÉXICO and AEROLITORAL | § | |
| S.A. DE C.V., d/b/a AEROMÉXICO CONNECT, | § | |
| Defendants | § | |

# PLAINTIFFS' ORIGINAL COMPLAINT

## Passenger Safety is an Airline's Number One Priority. [1]

### INTRODUCTION

1.     On July 31, 2018, MARIA GERMANA OLGUIN, her daughter MARIA GUADALUPE HERRERA and MARIA GUADALUPE HERRERA's four minor children, UN, YN, YN and AIN, buckled themselves into their seats on AEROMÉXICO Flight 2431 from General Guadalupe Victoria Airport, a.k.a. Durango International Airport, to Mexico City, the first leg of their return flight to Houston, Texas. For them, there was no more important priority than the safe takeoff and landing of Flight 2431. Instead, Flight 2431 crashed shortly after takeoff, injuring all six.

---

[1] Aeroméxico agrees. "For Aeroméxico the safety of its customers is the main priority and therefore the more than 14,000 Aeroméxico employees are committed to the well-being of passengers and their families." Statement from Aeroméxico Regarding Flight AM 2431 (July 31, 2018), *available at* www.airlinestaffrates.com/statement-regarding-flight-am-2431 (last viewed September 22, 2018).



2.     Plaintiffs MARIA GUADALUPE HERRERA, individually and as next friend of UN, YN, YN and AIN, her four minor children, and MARIA GERMANA OLGUIN bring this action under the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, Canada on May 28, 1999 (hereinafter "the Montreal Convention"), against Defendants AEROVIAS DE MÉXICO, S.A. DE C.V. (INC.), d/b/a AEROMÉXICO, and AEROLITORAL S.A. DE C.V., d/b/a AEROMÉXICO CONNECT, seeking damages for their injuries.

## PARTIES

3.     Plaintiffs MARIA GUADALUPE HERRERA, her four minor children and her mother, MARIA GERMANA OLGUIN, have their principal and permanent residence in Clute, Brazoria County, Texas. Plaintiff MARIA GUADALUPE HERRERA purchased plane tickets in Texas from Defendants through their authorized agents for herself, her four children, and MARIA GERMANA OLGUIN to fly on Aeroméxico Flight 2431. The flight reservation confirmation states the flights are "Aeromexico" flights "operated by

-2-

AEROLITORAL DBA AEROMEXICO CONNECT" (see Exhibit A). The flight from Durango to Mexico City was the first leg of their return trip home from Mexico. Plaintiffs had flown from Houston to Durango via Mexico City earlier in July, and they were retracing their steps. The flight schedule called for Plaintiffs to change planes in Mexico City and then board a flight to George Bush Intercontinental Airport, located in Houston, Texas.

4.      Defendant AEROVIAS DE MÉXICO, S.A. DE C.V. (INC.), d/b/a AEROMÉXICO ("AEROMÉXICO") is a for profit foreign corporation. AEROMÉXICO is a foreign air carrier operating in the United States under Federal Aviation Regulation Part 129 with Federal Aviation Registration Certificate Number ASMF152F. At all relevant times AEROMÉXICO was a common carrier by air, operating aircraft in the State of Texas for the transportation of passengers for hire. AEROMÉXICO advertises that it provides roundtrip services between a number of locations in Mexico and Central America, and cities in the State of Texas, including Houston, Austin, Dallas and San Antonio.[2] AEROMÉXICO sells tickets to fly on its aircraft or the aircraft of affiliated carriers to Texans over the internet and through agents here in Texas, as well as at customer service counters in airports across the State manned by agents, servants and/or employees of Defendant. Defendant is licensed to do business in the State of Texas and actively engages in business in Texas, including entering into contracts to be performed in Texas, purchasing and selling goods and services in Texas and advertising for business in Texas. Defendant has places of business in Texas, employees who work in Texas, owns and/or leases property in Texas and pays taxes in Texas. Further, Defendant has filed lawsuits in Texas and availed itself of the Texas Judicial system. Defendant AEROVIAS

---

[2] https://flights.aeroméxico.com/en-us/flights-to-united-states (last viewed September 17, 2018)

DE MÉXICO, S.A. DE C.V. (INC.), d/b/a AEROMÉXICO may be served with process and a copy of Plaintiff's Original Complaint through its agent for service of process: Jose Quant at 3663 North Sam Houston Parkway East, Suite 500, Houston, Texas 77032.

5.     Defendant AEROLITORAL S.A. DE C.V., d/b/a AEROMÉXICO CONNECT ("AEROMÉXICO CONNECT") is a for profit foreign corporation. AEROMÉXICO CONNECT is a foreign air carrier operating in the United States under Federal Aviation Regulation Part 129 with Federal Aviation Registration Certificate Number LVQF318F. At all relevant times, AEROMÉXICO CONNECT was a common carrier by air, operating aircraft in the State of Texas for the transportation of passengers for hire. AEROMÉXICO CONNECT sells tickets to fly on its aircraft or the aircraft of affiliated carriers to Texans over the internet and through agents or affiliates here in Texas, as well as at customer service counters in airports across the State. Defendant is licensed to do business in the State of Texas and actively engages in business in Texas, including entering into contracts to be performed in Texas, purchasing and selling goods and services in Texas and advertising for business in Texas. Defendant has places of business in Texas, employees who work in Texas, owns and/or leases property in Texas and pays taxes in Texas. Defendant AEROLITORAL S.A. DE C.V., d/b/a AEROMÉXICO CONNECT may be served with process and a copy of Plaintiff's Original Complaint through one of the individuals listed as its agent for service of process in various documentation located on the Texas Secretary of State's website: Steve Milburn at 3663 North Sam Houston Parkway East, Suite 500, Houston, Texas 77032; or Jose Quant at 3663 North Sam Houston Parkway East, Suite 500, Houston, Texas 77032. (*See September 1, 2016 Franchise Tax Report*, attached as Exhibit B).

**JURISDICTION AND VENUE**

6.      This Honorable Court has jurisdiction over this claim pursuant to 28 U.S.C. §1331 and under the Montreal Convention, an international treaty to which the United States is a signatory. The flight constituted an international carriage of persons, as defined by Article 1 of the Convention. Jurisdiction is proper under Article 33 because Houston was the Plaintiffs' "place of destination" as that term is defined by the Montreal Convention, the Plaintiffs have their principal and permanent residence in Clute, Texas and both Defendants operate services for the carriage of passengers by air in Texas, either on their own aircraft or on another carrier's aircraft pursuant to a commercial agreement, and the Defendants conduct their business of carriage of passengers by air from premises they either own or lease in Texas or that are owned or leased in Texas by another carrier with which Defendants have a commercial agreement.

7.      This Honorable Court has personal jurisdiction over Defendants. Plaintiffs purchased their tickets to fly on Defendants' flights, including the flight that crashed, here in Texas through an authorized agent of Defendants that actively solicits business in Texas on behalf of Defendants and sells tickets to Texas residents for the financial benefit of Defendants. The tickets Plaintiffs purchased were delivered to Plaintiffs in Texas. The Plaintiffs' principal and permanent residence is in the Southern District of Texas and the ultimate destination of their flights on July 31, 2018 was Houston, Texas. Further, the Defendants have each established minimum, purposeful contacts with Texas that are so continuous and systematic as to render both Defendants essentially at home in Texas. Defendants have sought benefit, advantage and/or profit by availing themselves of the Texas market and could reasonably anticipate being called into a Texas court, especially

given the provisions of the Montreal Convention and their status as airlines that actively promote in Texas the sale of tickets on their international flights as well as the sale of tickets on connecting flights that are part of international travel. The exercise of jurisdiction here comports with "traditional notions of fair play and substantial justice," and the exercise of jurisdiction is reasonable under the circumstances.

8.      Venue is proper in the Southern District of Texas under Article 33, Paragraphs (1) and (2) of the Montreal Convention. Houston was Plaintiffs' "place of destination" and the Southern District of Texas is where Plaintiffs purchased their tickets and is Plaintiffs' principal and permanent residence. Both Defendants operate services for the carriage of passengers by air, either on their own aircraft or on another carrier's aircraft pursuant to a commercial agreement, and both Defendants conduct their business of carriage of passengers by air from premises they either own or lease in the Southern District of Texas or that are owned or leased by another carrier with which Defendants have a commercial agreement. Venue is also proper under 28 U.S.C. §1391(b)(1) because Defendants are residents of the Southern District of Texas as that term is defined in 28 U.S.C. §1391(c)(2).

## FACTUAL ALLEGATIONS

### *The Purchase and Delivery of Tickets in Texas*

9.      Prior to July 31, 2018, Plaintiff MARIA GUADALUPE HERRERA purchased tickets from Defendants through an authorized agent for commercial air transportation from Houston, Texas to Durango and back for herself, her four minor children (ages 2-15) and her mother, Plaintiff MARIA GERMANA OLGUIN (collectively referred to as "the

Olguin family") (Exhibit A)[3]. The purpose of this purchase was so these six members of the Olguin family could participate in a much-anticipated reunion of three generations of an American family with their Mexican family and old friends in Santiago Papasquiaro. This beautiful mountain town of approximately 48,000 inhabitants, nestled on the eastern slopes of the Sierra Madre Occidental at an altitude of 5,742 ft. above sea level, was the home of their ancestors. The Olguin family's arrival coincided with the town's annual celebration of its patron saint, and they planned to spend two weeks in Mexico with their loved ones before returning home.

10.     Prior to July 31, 2018, Defendants, through an authorized agent, issued and delivered tickets to Plaintiff MARIA GUADALUPE HERRERA in Texas for commercial air transportation for their trip. Included in this itinerary was Aeroméxico Flight 2431, from Durango International Airport to Mexico City, where Plaintiffs and the four children would change planes and catch a return flight to George Bush Intercontinental Airport.

11.     Although the reservation confirmation for Flight 2431 describes the flight as an Aeroméxico flight, it also notes the flight was operated by Aeroméxico Connect. On information and belief, at all relevant times there was a code-sharing arrangement between Defendants whereby Aeroméxico's designator code was used to identify flights operated by Aeroméxico Connect, including Flight 2431.

### *The Unsafe Weather Conditions*

12.     On July 31, 2018, the Olguin family said their goodbyes and traveled to the Durango International Airport to begin their journey home to Houston via Mexico City. The

---

[3] As evidenced by the flight reservation confirmation, the parties regarded this carriage as a single operation, from Houston to Durango and back.

day began with sunshine. The check-in and boarding process for Flight 2431 was uneventful. The Plaintiffs' first hint of a problem came only after the Olguin family was seated on the Brazilian-made Embraer ERJ-190AR jet aircraft. It was then Maria Guadalupe Herrera first noticed the rapidly darkening skies, increasing wind and heavy rain. The weather had quickly and dramatically deteriorated.

13.     While the passengers boarded, the assigned flight crew (later identified as Captain Carlos Galván Meyran, First Officer Daniel Dardon Chávez, and flight attendants Samantha Hernandez Huerta and Brenda Zavala Gomez), all of whom were employees of one or both Defendants, acting in the course and scope of their employment, began to prepare for takeoff.



14.     As the flight crew continued their takeoff preparations, weather conditions continued to deteriorate. Tempestuous winds, rain and hail were observed and

experienced, as shown in the progression of photos below, which document the storm over Durango on July 31, 2018.[4]

  

The Reverend Ramin Parsa, one of the passengers, described developments as follows:

> "When we were boarding the airplane, everything was fine, the weather was perfect. By the time everybody boarded the airplane, suddenly, a dark cloud began to come in. And so, it began to rain heavily, and the wind was blowing very, very heavily. The trees are bent. That's how strong the wind was. An airplane was shaking, so I thought, 'Well, we're going to have probably an hour-to-30-minutes delay. We're going to wait here until this clears up, so we can take off."[5]

Jonathan Belles, weather.com meteorologist, later commented on the conditions present at the time AEROMÉXICO Flight 2431 prepared for takeoff:

> "Winds were shifting at the time due to nearby thunderstorms. Earlier, thunderstorms with strong winds and heavy rain with marble-sized hail lashed Durango city, damaging hangars at the airport."[6]

---

[4] Storyful.com video, *Intense Storm Hit Durango Before Aeroméxico Crash*, August 1, 2018, available at: https://licensed.storyful.com/videos/206509 (last viewed September 30, 2018).

[5] *Here and Now: Interview with Ramin Parsa* (WBUR radio broadcast, August 8, 2018), *available at* http://www.wbur.org/hereandnow/2018/08/08/aeroméxico-crash-survivor-ramin-parsa (last viewed September 22, 2018).

[6] Associated Press, *Plane in Mexico Crashes in Shifting Winds and Hail, 49 Injured but No Deaths Reported* (August 1, 2018), *available at* www.weather.com/news/news/2018-07-31-mexico-plane-crash-durango-injury (last viewed September 22, 2018).

Travel industry analyst Henry Harteveldt observed:

> "Pilots have the right, by the way, to say I don't think it's safe, I don't care what the airline says. I'm not going to be taking off until I'm convinced it's as safe as it's going to be."[7]

Defendants' pilots negligently failed to exercise that right.

### *The Negligent Decision to Take Off*

15.    Despite the visibly dangerous weather conditions, Defendants' pilots, for reasons unfathomable, chose to challenge the violent forces of nature rather than wait for the tempest to pass. The pilots gambled with the 103 lives on board, presumably betting they could outrun the storm. The Reverend Ramin Parsa recounted his stunned reaction to the decision to take off under the prevailing conditions:

> "I wouldn't believe that the pilot [would] take off, and so I began to film the outside. I was filming the rain, and, suddenly, the airplane began to move, and he began to speed up to takeoff, and I said, 'Well, maybe he knows what he's doing. That's his job.'"[8]

Dorelia Rivera, another passenger, put it very succinctly when she told NBC5 in Chicago:

> "We took off—it was pouring rain—honestly I thought 'why in the world are we even taking off.'"[9]

Ashley Garcia, a 17-year-old from Chicago who had traveled to Mexico for a wedding, looked out the window, saw the jets' wings shaking because of the wind and thought:

> "We are not about to take off, this is insane."[10]

---

[7] CBS News, *Aeromexico Crash: Americans in Plane Crash Share Dramatic Stories (August 2, 2018), available at* https://www.cbsnews.com/news/aeroméxico-plane-crash-durango-at-least-65-americans-on-board/ (last viewed September 22, 2018).

[8] Here and Now, *supra* at note 3.

[9] NBC5 Chicago, *The Plane Just Started Shaking* (July 31, 2018, updated August 1, 2018), *available at* https://www.nbcchicago.com/news/local/Chicago-Area-Priest-Injured-in--489685751.html (last viewed September 17, 2018).

[10] Holly Yan, *supra* at note 6.

16.     The Dirrecion General de Aeronautica (the Mexican governmental agency that investigates aviation crashes in Mexico) distributed the following photographs, taken by a fixed camera at the Durango International Airport, documenting the onset of the horrific weather conditions. The second photo, on information and belief, was taken approximately one minute prior to takeoff.







17.     The Brazilian Embraer E-190AR's twin jet engines were no match for Mother Nature's fury. Alberto Herrera, a 35-year-old web developer from Chicago, described what transpired:

> "You start gaining speed and as soon as you start taking off all of the sudden the plane starts struggling and it's getting hit with hail … The higher up we went into the storm the heavier the hail got, and more wind got to us."[11]

The shuddering aircraft lurched up, down and sideways, then crashed violently in an open field near the runway's end.



The Reverend Ramin Parsa told CBS News that, given the weather conditions:

> "I think it was a mistake by the pilot. He should not have taken off."[12]

### *The Crash*

18.     The fuel-laden Brazilian made Embraer ERJ-190 and its 103 occupants were slammed violently onto the runway almost immediately upon takeoff. The aircraft lost both of its jet engines, burst into flames, and filled with suffocating smoke. Passengers

---

[11] Associated Press, *supra* at note 4.

[12] CBS News, *supra* at note 5.

later reported the Embrarer ERJ-190 "bounced like a ball" down the runway and into an adjacent field; the cabin went dark, overhead luggage compartments opened, and their contents became projectiles striking seated passengers and then obstructing the emergency exit ways.



[13]



---

[13] Map (Graphics: Aviation Herald/Google Earth).

19.    Reverend Parsa described the scene after the crash:

"People were screaming and panicking and trying to get out. All the lights of the airplane went off. It was pitch dark, and smoke started coming in. That was, in my opinion, the worst part, because the smoke was terrifying. Didn't have time to think, to breathe, and everybody's trying to open the door."[14]

…

"Imagine you put 100 people in a room, in a dark room, pitch dark, filled with smoke and there's a small door, everybody's trying to find it. That's what the situation was."[15]

Jose Luis Corral, a 52-year-old business owner from Portland, Oregon, recalled:

"It's so fast, terrifying to see all the people screaming."[16]

Jacqueline Flores, a resident of Bogota, Colombia, described her efforts to exit the

burning aircraft with her child:

"People were in a panic; there was one family with their three children and another man who was bleeding from the head."[17]

"When the aircraft stopped, and we tried to exit, the aisle was blocked with a large number of suitcases that had fallen in it; meanwhile the fire was spreading, and a lot of smoke was coming in. Our seats were located by one of the wings, we took advantage of a hole that was there and, despite the fire there, we escaped."[18]

---

[14] Here and Now, *supra* at note 3.

[15] Christopher Sherman, *Mexico Plane Hit Sudden, Violent Storm Before* Crash, Associated Press, (August 1, 2018, updated August 2, 2018), *available at* www.thevillagereporter.com/mexico-plane-hit-sudden-violent-storm-before-crash-2/ (last viewed September 22, 2018).

[16] *Id.*

[17] Javier Arce, David Agren and Sergio R. Bustos, *Survivors Recount Chaos, Miraculous Evacuation after Aeromexico Plane Crashes, Burns after* Takeoff, USA TODAY NETWORK (July 31, 2018, updated August 2, 2018), *available at* www.usatoday.com/story/news/world/2018/07/31/aeromexico-flight-crashes-mexico-100aboard/875661002 (last viewed September 22, 2018).

[18] Orale; http://durango.oralequechiquito.com/2018/07/31/se-desploma-y-explota-un-avion/ (last viewed September 21, 2018).

Flores went on to say that while she and other passengers gathered and prayed from a distance, they saw the plane— from which they had escaped only minutes earlier— erupt into a ball of fire.[19]

### Post-Crash Safety Failures

20.    The crash and resulting power outage in the cabin resulted not only in pandemonium, but the exposure of aircraft and training deficiencies. Passengers reported they were unable to evacuate efficiently because of darkness caused by the lack of lighting and smoke. European Aviation Safety Agency (EASA) and FAA regulations both require emergency floor path illumination. Based on information and belief, those requirements were not met.

21.    The passengers' lives were further jeopardized in the post-crash evacuation by the failure of the Flight Crew and Flight Attendants to act appropriately during the emergency. Plaintiffs were seated on the aft port side of the aircraft and were never provided directives, much less assistance, during the course of the evacuation. This failure is evidenced by the absence of flight personnel voices providing direction to passengers in Ramin Parsa's video recording of the post-crash events.

22.    The flight attendants abandoned their posts and exited the aircraft prior to assuring all passengers had safely disembarked. In the case of Plaintiffs, an injured Maria Guadalupe Herrera (MRIs have established multiple cervical and lumbar disc herniations resulting from the crash) assisted her four children to the aft port emergency exit on her own, entrusted her two-year-old baby girl to her 12-year-old daughter, and returned alone to rescue her 75-year-old mother, Maria Germana Olguin, who she found still seated in

---

[19] Javier Arce, David Argen and Sergio Bustos, *supra* at note 16.

the burning, smoke-filled aircraft, unable to exit on her own power. (MRIs have since established that Maria Germana Olguin suffered a pelvic fracture and a severe lumbar vertebral body compression fracture.)



23.     Mother and daughter proceeded together to the aft port emergency exit and stood at the exit door, preparing to escape the burning aircraft on the emergency slide. They heard a voice crying out from a distance, "Get away from there; get away from there! The plane is going to explode." It was the voice of one of Defendants' flight attendants, from a safe place a hundred yards away, calling to emphasize the danger facing the last escaping passengers.

24.     Plaintiffs exited the aircraft on the escape slide into a driving rain. A good Samaritan passenger risked his life to assist the injured women to safety from the aircraft, while the Defendants' flight attendant continued to watch from a distance.

25.     The family was reunited and together they hobbled to the runway, approximately 400-500 yards away, where first responders separated them once again. Maria Germana Olguin was transported to the military hospital, where she was hospitalized for two days. She was discharged without being provided a copy of her medical records, much less arrangements for follow-up care in the United States.

26.     Maria Guadalupe Herrera and her children were transported to the Hospital General 450 in Durango, where they were evaluated, released and sent home without medical records or arrangements for follow-up care.

### *The Delayed Admission of a Third Pilot*

27.     Within hours of the crash, the Governor of Durango, José Rosas Aispuro Torres, reported that Flight 2431 initiated the takeoff at 3:30 p.m. and after taking off the aircraft was affected by a gust of wind that caused it to descend suddenly and hit the ground with the left wing, so that the two engines came off.[20] Thus, a cover story was created that would be repeated over and over by the media, Defendants, and later government investigators— the crash of Flight 2431 was caused by the weather.

28.     Initially, no one appears to have publicly asked the simple question: Why did the pilots attempt to take off in this severe storm? Instead, upon determining there were no fatalities, the crew members of AEROMÉXICO Flight 2431 were hailed as national heroes, a portrayal promoted by Defendants.[21] The crash was dubbed the "Miracle in Durango"; presumably drawing parallels with the "Miracle on the Hudson". The Captain was credited for saving the passengers and the crew, and the authorities immediately began blaming the crash on a freak meteorological event before any investigation was begun, much less completed. For weeks Defendants and their flight crew basked in the glow of celebrity and national pride.

---

[20] BBC News, *Mexico plane crash: All 103 people on board survive* (August 1, 2019), available at [https://www.bbc.com/news/world-latin-america-45027112](https://www.bbc.com/news/world-latin-america-45027112) (last viewed on September 29, 2018).

[21] See*, supra* at note 1.

29.     Mexican reporters began investigating a story that sounded too good to be true. On August 24th an editorial published in Mexico City's *El Universal*, entitled "Why Hasn't the Third Pilot on Aeroméxico Flight 2431 Been Discussed?" asked why the presence of a third pilot in the cockpit was being concealed.

> His alleged presence in the cockpit is so relevant and can mean so much to the investigation about what happened in that accident that the parties involved have preferred not to make it known.[22]

Once that editorial was published, the Defendants and investigators were backed into a corner.

30.     On September 6, 2018, 37 days after the crash that jeopardized the lives of 99 innocent passengers (88 adults, 9 children and 2 infants), AEROMÉXICO's CEO, Andrés Conesa, admitted for the first time that there was an unauthorized trainee in the cockpit of Flight 2431. During the course of his public confession Conesa revealed that Jose Ramon Vasquez, a "pilot in training", although  prohibited from being in the cockpit, had been allowed by the Captain  to sit in the First Officer's seat and commence takeoff.[23] It was later reported "the plane's commanding officer [only] took over controls from the trainee just before the crash."[24] Luis Gerardo Fonseca, Director General of the Mexican Civil Aviation Agency stated:

---

[22] Carlos Loret de Mola, *El Misterio del Tercer PIloto en la Cabina del Avion Accidentado en Durango*, El Universal (August 24, 2018) (translated from Spanish to English), *available at* http://www.eluniversal.com.mx/columna/carlos-loret-de-mola/nacion/el-misterio-del-tercer-piloto-en-la-cabina-del-avion-accidentado (last viewed September 24, 2018).

[23] Ardy Torres, *Three Pilots Hailed as Heroes for Saving Lives of 103 People when Aeromexico Flight Crashed are FIRED as it's Revealed a Trainee was at the Controls During Take-off,* Dailymail.com (September 7, 2018), *available at* https://www.dailymail.co.uk/news/article-6144601/Three-pilots-hailed-heroes-July-crash-Durango-Mexico-fired-Mexican-airline.html (last viewed September 22, 2018).

[24] *Id.*

> We know, from the voice recordings, that the pilot in training applies that throttle and starts the takeoff, and then the commander takes command. The loss of lift occurs after the Captain is at the controls, but we still have to determine the precise moment [in which the captain takes full control of the aircraft, given that until then he was only in supervisory mode].[25]

The trainee had been engaged in some sort of "unauthorized en route training session"[26] prior to the crash, in violation of Aeromexico's corporate policies, procedures and protocols.



31.     After revealing the presence of Mr. Vasquez and his role, a fact Defendants surely must have known from day one, Mr. Conesa wrote a letter to Defendants' employees, stating:

> "the behavior of the three pilots in the cockpit was not carried out according to established protocols, deliberately violating the policies, manuals and procedures of our company."[27]

---

[25] Ignacio Fariza, *La Investigacion del accidente de Aeromexico se centra en cuando recupero los mandos del avion el commandante,* El Pais Internacional (September 14, 2018) (translated from Spanish to English), *available at* https://elpais.com/internacional/2018/09/14/mexico/1536884107001407.html (last viewed October 2, 2018).

[26] The exact Spanish phrase used was: "Una sesión de habilitación en ruta no autorizada". La Redaccion, *Tripulante hizo funciones de copiloto en avión de Aeroméxico accidentado en Durango: DGAC*, Proceso.com.mx (September 5, 2018), *available at* https://www.proceso.com.mx/549785/tripulante-hizo-funciones-de-opiloto-en-avion-de-aeromexico-accidentado-en-durango-dgac (last viewed September 24, 2018).

[27] *Id.*

Mr. Conesa's statement was particularly striking because he had consistently maintained the aircraft and personnel had performed in a stellar manner, and the weather was the likely culprit. After confessing this misconduct by Defendants' employees, Mr. Conesa proceeded to announce that all three men were fired.

> "This type of behavior is unacceptable, and we will not tolerate [it] for any reason. [It] put at risk the trust that more than 20 million give us."[28]

32.     The Mexican civil aviation authorities also responded to the revelation of the presence and role of the pilot in training. They ordered all Mexican airlines implement policies and procedures prohibiting, except in rare circumstances, any person not belonging to the flight crew from occupying "the seats of the command posts during the pre-flight, the flight and post-flight".[29]

33.     Flight 2431 was under the exclusive possession, control and management of Defendants, acting through their agents, servants, and employees. The positioning and roles of the pilots and "pilot in training" was under the exclusive control of Defendants, acting through their agents, servants and employees. The decision to take off was under the exclusive control of Defendants, acting through their agents, servants, and employees. The Plaintiffs had no control over, and in no way caused or contributed to, the crash and/or disembarking process that caused the injuries they sustained.

---

[28] *Id.*

[29] The announcement was reported in the Mexican press as follows: "El lunes, las autoridades mexicanas dieron un plazo de un mes para que todas las aerolíneas que operan en el país norteamericano impidiesen— salvo en contadísimas excepciones— que cualquier persona ajena a la tripulación ocupe 'los asientos de los puestos de mando durante el prevuelo, el vuelo y postvuelo'." Ignacio Fariza, *supra* at note 24.

***The Promise***

34. After the crash, at a press conference with the Aeroméxico Chairman of the

Board, Aeroméxico CEO Andrés Conesa said,

> "The most important thing is that the passengers are fine. We are
> sending them to public and private hospitals. 100% of the expenses
> will be covered by Aeroméxico."[30]



He assured the public that AEROMÉXICO would cover 100% of the medical expenses

caused by the crash.[31] AEROMÉXICO no doubt derived a great deal of public goodwill

when it made this promise. This is a promise not yet fulfilled.

35. Plaintiffs made repeated requests for medical assistance to their assigned

AEROMÉXICO handler. Plaintiffs made it known they did not possess health insurance

or the financial wherewithal to pay cash for medical and psychological support for the

adults or children. They were instructed to pay for the medical care and submit their

---

[30] Forbes Staff, *Aeroméxico will cover 100% of expenses due to accident: Andrés Conesa*, Forbes Mexico (Julio 31, 2018) *available at* https://www.forbes.com.mx/ aeromexico-cubrira-el-100-de-los-gastos-por-accidente-andres-conesa/ (last viewed September 22, 2018).

[31] *Id.*

receipts to AEROMÉXICO for consideration. This effectively resulted in the denial of timely medical care and has resulted in further hardships to Plaintiffs arising out of injuries that were no fault of their own. Reverend Ramin Parsa summed it up well:

> "They [Aeroméxico] really haven't been professional. It's sad, they haven't even reached out to us ever since. Even for coming back, we had to call them multiple times and be on the line for 20 minutes, 30 minutes, to figure something out. And they really haven't even reached out to us."[32]

### *Plaintiffs' Injuries*

36.     As a result of the crash and/or disembarking from the burning plane Plaintiff MARIA GUADALUPE HERRERA sustained physical injuries, including injuries to her head and face, herniated discs in her neck and low back, and psychological injuries.

37.     As a result of the crash and/or disembarking from the burning plane each of the four minor children sustained physical injuries and psychological injuries.

38.     As a result of the crash and/or disembarking from the burning plane Plaintiff MARIA GERMANA OLGUIN sustained physical injuries to her pelvis and spine, including a pelvic fracture and a severe lumbar vertebral body compression fracture, as well as psychological injuries.

## CAUSES OF ACTION

### *Article 17 of the Montreal Convention*

39.     Because Flight 2431 was the first leg of Plaintiffs' international trip with its ultimate destination in Houston, the Montreal Convention governs this claim. Pursuant to Article 17(1) of the Montreal Convention, the Defendants are liable for damages sustained as the result of "bodily injury of a passenger upon condition only that the accident which

---

[32] Here and Now, *supra* at note 3.

caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." The crash involved in this action constitutes an abnormal or unusual condition external to the Plaintiffs, the Plaintiffs neither caused nor contributed to the crash or their injuries, and the injuries and damages sustained by all six of the Plaintiffs in this action occurred either in the crash while Plaintiffs were on board the aircraft or during the disembarking process.

### *Article 21(2) of the Montreal Convention*

40.     Under the Montreal Convention a defendant may limit its damages to a maximum of 113,100 Drawing Rights per plaintiff if it proves:

   a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or

   b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

Defendants cannot prove either. Defendants and their agents and servants were negligent, and the negligence of Defendants was the legal cause of Plaintiffs' damages. The damages sustained by the Plaintiffs were not solely due to the negligence or wrongful act or omission of a third party.

### *Articles 39-41 of the Montreal Convention*

41.     In the event it should be determined that Aeroméxico was not the "actual carrier", as that term is defined by the Montreal Convention, Aeroméxico is liable to Plaintiffs under the Montreal Convention pursuant to Articles 39-41.

42.     Aeroméxico, if it was not "the actual carrier", was the "contracting carrier". It made the contract of carriage with Plaintiffs for Flight 2431. On information and belief, that contract was made through a code-sharing arrangement between Defendants.

43.     As set forth in Article 40 of the Montreal Convention, as a contracting carrier, Aeroméxico is subject to the rules of the Convention.

44.     As set forth in Article 41 of the Montreal Convention, if Aeroméxico Connect and not Aeroméxico is deemed to be the actual carrier, the actions of Aeroméxico Connect's agents and servants in the course and scope of their employment are deemed to be those of Aeroméxico.

## DAMAGES

45.     Plaintiff MARIA GUADALUPE HERRERA has incurred substantial damages due to the incident described above. There are certain elements of damage, provided by law, that Plaintiff is entitled to have considered separately to determine the sum of money that will fairly and reasonably compensate her for the injuries, damages, and losses she has, and will, incur. From July 31, 2018, until the time of trial of this cause, those elements of damage which should be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate MARIA GUADALUPE HERRERA are:

> a.     The physical pain that she has suffered;
>
> b.     The mental anguish that she has suffered;
>
> c.     The amount of reasonable medical expenses necessarily incurred in the treatment of her injuries;
>
> d.     The loss of earning capacity she has suffered; and
>
> e.     The damages resulting from the physical impairment she has suffered.

MARIA GUADALUPE HERRERA would show that in reasonable probability her injuries and damages will continue into the future. Plaintiff's future losses, from the date of trial and beyond, include:

f.      The physical pain that she will suffer in the future;

g.      The mental anguish that she will suffer in the future;

h.      The reasonable value of the medical expenses that will necessarily be incurred in the treatment of her injuries after trial;

i.      The reduction in her future earning capacity; and

k.      The damages resulting from the physical impairment that she will continue to suffer in the future.

46.     UN, YN, YN and AIN (minors) have each incurred damages as a result of the plane crash made the basis of this lawsuit. There are certain elements of damage, provided by law, that each is entitled to have considered separately to determine the sum of money that will fairly and reasonably compensate each for the injuries, damages, and losses each has, and will, incur. From July 31, 2018 until the time of trial of this cause, those elements of damage which should be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate UN, YN, YN and AIN (minors) are:

a.      The physical pain that each has suffered; and

b.      The mental anguish that each has suffered.

UN, YN, YN and AIN (minors) would show that in reasonable probability their injuries and damages will continue into the future. The future losses each will incur, from the date of trial and beyond, includes:

c.      The physical pain that each will suffer in the future;

d.      The mental anguish that each will suffer in the future; and

e.      The reasonable value of the medical expenses that will necessarily be incurred after each achieves majority in the treatment of their injuries after trial.

47.     As a result of the injuries sustained by UN, YN, YN and AIN, MARIA GUADALUPE HERRERA is liable for the costs of their reasonable and necessary medical care until each achieves majority. In addition to the damages for her own injuries, MARIA GUADALUPE HERRERA is entitled to recover that sum of money that will fairly and reasonably compensate her for the reasonable and necessary medical costs UN, YN, YN and AIN will incur from July 31, 2018 until the date of trial, and from the date of trial until UN, YN, YN and AIN each achieves majority.

48.     Plaintiff MARIA GERMANA OLGUIN has incurred substantial damages due to the incident described above. There are certain elements of damage, provided by law, that Plaintiff is entitled to have considered separately to determine the sum of money that will fairly and reasonably compensate her for the injuries, damages, and losses she has, and will, incur. From July 31, 2018, until the time of trial of this cause, those elements of damage which should be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate MARIA GERMANA OLGUIN are:

      a.     The physical pain that she has suffered;

      b.     The mental anguish that she has suffered;

      c.     The amount of reasonable medical expenses necessarily incurred in the treatment of her injuries; and

      d.     The damages resulting from the physical impairment she has suffered.

MARIA GERMANA OLGUIN would show that in reasonable probability her injuries and damages will continue into the future. Plaintiff's future losses, from the date of trial and beyond, include:

e.      The physical pain that she will suffer in the future;

f.      The mental anguish that she will suffer in the future;

g.      The reasonable value of the medical expenses that will necessarily be incurred in the treatment of her injuries after trial; and

h.      The damages resulting from the physical impairment that she will continue to suffer in the future.

49.      Each Defendant was a proximate cause of both the occurrence in question and all the Plaintiffs' injuries and damages. MARIA GUADALUPE HERRERA, both individually and as next friend of her four minor children, and MARIA GERMANA OLGUIN bring this cause of action to recover damages to the extent allowed by law from Defendants.

## JURY DEMAND

50.      Plaintiffs demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

## PRAYER

WHEREFORE, Plaintiffs pray that citation be issued and served upon Defendants in the form and manner prescribed by law, requiring that Defendants appear and answer herein; that upon final hearing hereon, Plaintiffs have judgment against Defendants, jointly and severally, for an award of actual damages to compensate each of them for the damages they each have sustained; pre-judgment interest as allowed by law; post-judgment interest; all costs of court; and all other relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

LAW OFFICE OF J. MICHAEL SOLAR, PLLC

By: ___/s/ J. Michael Solar_____
    J. Michael Solar
    State Bar No. 18824850
    Federal Bar No. 1413
    2 BLVD Place
    1700 Post Oak Boulevard, Suite 600
    Houston, Texas 77056
    (713) 850-1212
    (713) 513- 5329/FAX
    jmsolar@solarlaw.com

    and

LAW OFFICE OF RICHARD SCHECHTER, P.C.

By: ___/s/ Richard Schechter_____
    Richard Schechter
    Federal Bar No. 1278
    State Bar No. 17735500
    1 Greenway Plaza, Suite 740
    Houston, Texas 77046
    (713) 623-8919
    (713) 622-1680/FAX
    richard@rs-law.com

ATTORNEY FOR PLAINTIFFS
MARIA GUADALUPE HERRERA
Individually and as next friend of UN,
YN, YN and AIN, minor children, and
MARIA GERMANA OLGUIN

## Flight overview



**Travel dates**
Jul 18, 2018 - Jul 31, 2018

**Itinerary #**
7337956525457

**Your reservation is booked and confirmed. There is no need to call us to reconfirm this reservation.**

**Confirmation**
ZJMHMG (Aeromexico)

**Ticket #**
1397058535355 (Maria Guadalupe Herrera)
1397058535356 (Y      N      i)
1397058535359 (U      N      )
1397058535360 (Maria De Herrera)
1397058535357 (Y    N      )
1397058535358 (A           N      )

Change or cancel this reservation

**You can still add cancellation, medical and baggage protection.**

Protect My Trip

Expires 24 hours after confirmation of flight booking

---

⊗ **Departure** Wed, Jul 18

Web Fare

Aeromexico 419 operated by AEROLITORAL DBA AEROMEXICO CONNECT

| **Houston (IAH)** | | **Mexico City (MEX)** |
|---|---|---|
| 12:45pm | → | 3:05pm |
| Terminal: D | | Terminal: 2 |

Cabin: Economy / Coach (N)
2h 20m duration

---

🕓 2h 56m stop Mexico City (MEX)

# EXHIBIT A

1/4

Aeromexico 2600 operated by AEROLITORAL DBA AEROMEXICO CONNECT

**Mexico City (MEX)**
6:00pm
**Terminal: 2**

→

**Durango (DGO)**
7:49pm

Cabin: Economy / Coach (N)
1h 49m duration

---

**Total Duration**

7h 4m

---

❌ **Return** Tue, Jul 31

Web Fare

Aeromexico 2431 operated by AEROLITORAL DBA AEROMEXICO CONNECT

**Durango (DGO)**
3:04pm

→

**Mexico City (MEX)**
4:45pm
**Terminal: 2**

Cabin: Economy / Coach (N)
1h 41m duration

---

🕐 3h 15m stop Mexico City (MEX)

---

Aeromexico 476 operated by AEROLITORAL DBA AEROMEXICO CONNECT

**Mexico City (MEX)**
8:00pm
**Terminal: 2**

→

**Houston (IAH)**
10:25pm
**Terminal: D**

Cabin: Economy / Coach (N)
2h 25m duration

---

**Total Duration**

7h 21m

---

Traveler(s)

**Maria Guadalupe Herrera**

No frequent flyer details provided

Y       N

No frequent flyer details provided

### U       N

No frequent flyer details provided

### Maria De Herrera

No frequent flyer details provided

### Y    N

No frequent flyer details provided

### A            N

No frequent flyer details provided

Frequent flyer and special assistance requests should be confirmed directly with the airline.

## Price summary

**Expedia+**

| | | |
|---|---|---|
| Traveler 1: | $266.00 | $408.13 |
| Adult FlightTaxes & Fees | | $142.13 |
| Traveler 2: | $266.00 | $408.13 |
| Adult FlightTaxes & Fees | | $142.13 |
| Traveler 3: | $266.00 | $408.13 |
| Adult FlightTaxes & Fees | | $142.13 |
| Traveler 4: | $266.00 | $408.13 |
| Senior FlightTaxes & Fees | | $142.13 |
| Traveler 5: | $266.00 | $408.13 |
| Child FlightTaxes & Fees | | $142.13 |
| Traveler 6: | $266.00 | $408.13 |
| Child FlightTaxes & Fees | | $142.13 |

490 points
for this trip

**Total**                                    **$2,448.78**

All prices are quoted in USD.

## Additional information

### Additional fees

The airline may charge additional fees for checked baggage or other optional services.

### Airline rules + restrictions

We understand that sometimes plans change. We do not charge a cancel or change fee. When the airline charges such fees in accordance with its own policies, the cost will be passed on to you.

Please read the complete penalty rules for changes and cancellations applicable to this fare.

**Tickets are nonrefundable and nontransferable.**

Please read important information regarding airline liability limitations .

---

## More help

Change or cancel this reservation.

Visit our Customer Support page.

Call Expedia Rewards blue Customer Care at 1-877-787-3117.

**For faster service, mention itinerary #7337956525457**

Filing Number: 12029706

 05-102
(Rev.9-15/33)

# Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

■ Tcode 13196 Franchise

| ■ Taxpayer number | ■ Report year | **You have certain rights** under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381. |
|---|---|---|
| 1 9 8 0 1 7 1 1 0 1 1 | 2 0 1 6 | |

| Taxpayer name | AEROLITORAL S.A. DE C.V. | ■ ○ Blacken circle if the mailing address has changed. |
|---|---|---|

| Mailing address | 3663 N SAM HOUSTON PKWY E STE 500 | Secretary of State (SOS) file number or Comptroller file number |
|---|---|---|
| City HOUSTON | State TX    ZIP code plus 4 77032 | 0012029706 |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office | 3663 N SAM HOUSTON PKWY E STE 500, HOUSTON, TX, 77032 |
|---|---|
| Principal place of business | 3663 N SAM HOUSTON PKWY E STE 500, HOUSTON, TX, 77032 |

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

**Please sign below!** This report must be signed to satisfy franchise tax requirements.

1000000000015

**SECTION A**  Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | | Term expiration | m m | d d | y y |
|---|---|---|---|---|---|---|---|
| CESAR GARCIA URIBE | DIRECTOR | ● YES | | | | | |
| Mailing address PASEO DE LA REFORMA 445 A Y B | City MEXICO | State OL CUAUHTEMO | ZIP Code 06500 | | | | |
| CESAR CHAPA | TREASURER | ○ YES | | | | | |
| Mailing address PASEO DE LA REFORMA 445 A Y B | City MEXICO | State OL CUAUHTEMO | ZIP Code 06500 | | | | |
| | | ○ YES | | | | | |
| Mailing address | City | State | ZIP Code | | | | |

**SECTION B**  Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C**  Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

| Registered agent and registered office currently on file *(see instructions if you need to make changes)* | You must make a filing with the Secretary of State to change registered agent, registered office or general partner information. |
|---|---|
| Agent: JOSE F QUANT | |

| Office: 3663 N SAM HOUSTON PKWY E 500 | City HOUSTON | State TX | ZIP Code 77032 |
|---|---|---|---|

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here ▶ | JOSE F QUANT | Title NT'L COMPTROLLER | Date 09/01/2016 | Area code and phone number ( 281 ) 372 - 3465 |
|---|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|

# EXHIBIT B